**FIRST HAWAIIAN BANK, as Trustee of the Joseph Campbell Trust, Plaintiff,**

v.

**RUSSELL & VOLKENING, INC. and Timothy Selds, Defendants.**

**No. 91 Civ. 1376 (LMM).**

United States District Court, S.D. New York.

June 7, 1994.

---

Charles Brainard, Kenyon & Kenyon, New York City, for plaintiff.

David Blasband, Deutsch Klagsbrun & Blasband, New York City, for defendants.

## MEMORANDUM AND ORDER

McKENNA, District Judge.

Plaintiff First Hawaiian Bank as Trustee of the Joseph Campbell Trust ("Bank"), filed this action on February 25, 1991, invoking the jurisdiction of this Court based on diversity of citizenship, pursuant to 28 U.S.C. § 1332. Plaintiff filed an Amended Complaint on September 10, 1993. Plaintiff charges Defendants Russell & Volkening, Inc. ("R & V") and Timothy Seldes, in their capacity as literary agent for Joseph Campbell and, upon his death, the Bank, with numerous state common law violations.[1] Defendants filed the instant motion on October 13, 1993, seeking disqualification of Plaintiff's counsel, Kenyon & Kenyon, and dismissal of the action with prejudice. For the reasons set forth below, Defendant's motion is denied.

### I.

This case involves a number of agreements entered into by the literary agent for Joseph Campbell and his successor in interest, the Bank, agreements that permitted Campbell's

---

1. The Court need not examine the exact nature of these charges in the context of the instant mo- tion.

work to be disseminated to a wide audience through a variety of media. Joseph Campbell, now deceased, was a world-renowned scholar and a prolific writer, whose works have been read, studied, and admired by many. Campbell's works have not only had a wide readership; they also have had an enormous influence on numerous fields of study. While Campbell himself, were he alive today, might detect in the present litigation echoes of mythic conflicts from ancient stories told and retold, this Court is summoned to a different task: to address the legal merits of Defendants' motion to disqualify Plaintiff's counsel and dismiss the action.

The Court recites only the facts necessary to decide the instant motion. Plaintiff, a banking corporation organized and existing under the laws of the state of Hawaii, is the Trustee of the Joseph Campbell Trust and, in this capacity, the successor in interest to the rights and properties (including the literary and contractual rights and properties) formerly held by Joseph Campbell. Defendant R & V is a corporation organized and existing under the laws of the state of New York, with its principal place of business in New York City. Defendant Seldes, a citizen and resident of New York, is the majority shareholder and president of R & V.[2] Together, Defendants served as the literary agent for, among others, Campbell and, upon Campbell's death, Plaintiff.[3] Plaintiff contends, and Defendants do not dispute, that Seldes is an experienced literary agent who, over the years, has negotiated numerous deals directly with attorneys concerning substance and terms and, in so doing, demonstrated a legal sophistication greater than that possessed by the average non-lawyer.

In order to understand the instant action, it is necessary to refer back to a previous litigation brought before this Court in 1989, involving two parties and their respective claims concerning rights to exploit a 1985 television series entitled "Joseph Campbell and the Power of Myth with Bill Moyers." On one side was a group composed of individuals and entities involved in producing and airing the television series (the "Moyers group"), and on the other side was one Stuart L. Brown, M.D., and Mythology, Ltd. (the "Mythology group"). The two parties each claimed the right to exploit the aforementioned television series on the basis of contracts entered into between the respective parties and either Campbell or the Bank. Significantly, the contracts on which each of the parties relies were negotiated, on behalf of Campbell or the Bank, by Defendants.[4] The Moyers group filed an action seeking a declaratory judgment and Mythology answered and also filed counterclaim against the Moyers group seeking damages. Subsequently, the Moyers group filed a Third-Party Complaint against the Bank, in its role as Trustee of the Joseph Campbell Trust, seeking to be compensated for any damages awarded to the Mythology group. The Bank, in turn, filed a Third-Party Complaint against the Mythology group on the basis of the latter's alleged unauthorized exploitation of certain works by Campbell.

By letter dated April 6, 1990, James C. Campbell, an attorney at Cades Schutte Fleming & Wright ("Cades Schutte"), the Hawaii law firm representing the Bank, asked Seldes to cooperate "in any way [he] c[ould]" with lawyers from the firm Kenyon

**2.** Defendants' view of the relationship between R & V and Seldes is reflected in their reference to Seldes as "Timothy Seldes d/b/a Russell & Volkening, Inc." Defs.' Mem.Law Supp.Mot.Disqualify Opposing Counsel at 3.

**3.** The Court rejects the argument advanced by Defendants that the services performed by Seldes made him "virtually ... a 'key employee'" of both Campbell and the Bank. See Defs.' Mem. Law Supp.Mot.Disqualify Opposing Counsel at 2. The Court credits Plaintiff's claim that Defendants at all times served as agent to, and not the employee of, Campbell and the Bank, because, as Plaintiff notes, and Defendants do not dispute, Defendants' reimbursement always came in the

form of commission, not salary, and, in addition, "Seldes appended a short clause setting out his fee to various contracts which he negotiated on behalf of" Campbell and the Bank. See Pl.'s Mem.Law Opp'n Defs.' Mot.Disqualify Pl.'s Counsel and Mot.Dismiss at 4.

**4.** *Seldes not only represented Campbell (and the Bank) in connection with the contracts between Campbell and both the Moyers group and the Mythology group, but he also acted as an agent for Mythology, Ltd., in book deals arising from its television productions of Campbell's materials.*

& Kenyon ("Kenyon")—the Bank's New York counsel—in connection with the aforementioned litigation (the "Moyers litigation"). Seldes had already agreed to cooperate with attorneys for both the Moyers group and the Mythology group, as evidenced by affidavits he provided to attorneys for the two parties, in conjunction with the Moyers litigation, prior to receiving the April 6, 1990, letter from James C. Campbell. In the course of providing the requested cooperation, Seldes participated in many phone calls with, and provided a great deal of documentation to, Kenyon attorneys. The nature of this documentation is, however, a matter of some dispute. Plaintiff contends, and presents affidavits to support its contention, that Defendants provided Kenyon attorneys with documentation, selected by Defendants for its purported relevance, over the course of approximately a half-dozen visits to Defendants' offices by Kenyon attorneys; Kenyon attorneys were permitted, on certain occasions, to carry off some of this material for the purposes of photocopying. Plaintiff insists, however, that it was provided only with information related to Defendants' dealings on behalf of Campbell and the Bank—material Plaintiff claims it was entitled to anyway, since it was the principal on whose behalf Defendants, as agent, had acted.

Defendants' version is, not surprisingly, somewhat different, and is supported by affidavit testimony as well. Defendants assert that Seldes, in his phone conversations with Kenyon attorneys and by permitting Kenyon attorneys full access to all of Defendants' files, divulged secrets and confidential information and documents to Kenyon concerning Defendants' involvement in, and knowledge of, the agreements underlying the Moyers litigation. Defendants claim that Seldes' cooperation was premised on his understanding, based on representations made to him by Kenyon attorneys, that

> "they" were all working together; that "they" were all on the same team; that it

was "them" against the rest—with the "they" being the Trust; the Bank; [Cades Schutte]; Kenyon & Kenyon; and Mr. Sedes [*sic*] and Russell & Volkening.

Defs.' Mem.Law Supp.Mot.Disqualify Opposing Counsel at 6–7.

Plaintiff denies any such representations, and contends that in fact Defendants were in a precarious position, since each side in the Moyers litigation was basing its case on a contract negotiated with Defendants on behalf of Campbell. Defendants, Plaintiff asserts, provided such information—and only such information—as they were obliged, as Defendants' agent, to provide: all documents generated on Campbell's (or Plaintiff's) behalf. Likewise, Plaintiff adds, Defendants provided such documents, for the same reason and with the same limited scope, to the Mythology group. Plaintiff contends, however, that attorneys for the Bank as well as for the Mythology group were forced to resort to subpoenas in order to obtain any other relevant documents from Defendants.

On September 10, 1990, pursuant to a subpoena, Seldes was deposed by attorneys involved in the Moyers litigation. Seldes appeared without counsel. The transcript of the deposition reflects that Seldes was apprised of his right to be represented by counsel at the deposition, but nonetheless resolved to continue the deposition. During the course of the deposition, attorneys for each of the represented parties, at different times, objected to certain questions put to Seldes on the ground of attorney-client privilege. Defendants point to the fact that Kenyon attorneys so objected to support their claim that the Kenyon attorneys represented Seldes as well as the Bank.[5] Plaintiff notes that while Kenyon did in fact so object, so too did the attorneys for each of the other represented parties.[6] It is uncontroverted that Kenyon attorneys did not direct Seldes not to answer any questions, and, moreover, during the course of the deposition, even

---

**5.** Defendants also assert, and Plaintiff vigorously denies, that Kenyon attorneys privately assured Seldes that they "represented" his interests as well, but that technicalities prevented them from openly averring that they formally represented Seldes.

**6.** Plaintiff argues, therefore, that if the Court were to follow Defendants' reasoning to its logical extreme, the Court would have to conclude that Seldes was represented by *all* the attorneys at the deposition.

when attorneys for each of the represented parties explained to Seldes his right to have an attorney present, Seldes never expressed a belief that he was represented by Kenyon.

In late January 1991, James C. Campbell wrote to Karen Uyemura, a Bank administrator, who in turn wrote to Defendants requesting that Defendants agree to waive the statute of limitations as to any claims the Bank might have against them. Defendants refused. Subsequently, the instant action was filed. Defendants claim that in a March 19, 1991, phone call, a Kenyon attorney assured Seldes that the Bank had no intention of serving the Complaint on Defendants, and that the filing of the Complaint was only a legal technicality. From March 1991 until May 1991, Defendants continued to cooperate with Kenyon attorneys in conjunction with both the Moyers litigation and a lucrative publishing agreement being negotiated between the Bank and HarperCollins. In May 1991, the Mythology group filed counterclaims against the Bank in the Moyers litigation, and, shortly thereafter, Plaintiff served the Complaint in the instant action on Defendants.

## II.

Defendants contend that Plaintiff's attorneys, Kenyon, have violated Canons 4, 5, and 9 of the New York Code of Professional Responsibility ("Code"), and therefore, should be disqualified from representing Plaintiff in the instant action. Defendants contend, specifically, that Kenyon has violated DR 4-101(A) & (B), DR 5-105(A)-(C), DR 5-108, and DR 5-109 (as well as Canon 9). The Court believes that Judge Mukasey accurately and succinctly stated the law of this Circuit with regard to motions for disqualification of counsel in *Bennett Silvershein Assocs. v. Furman*, 776 F.Supp. 800 (S.D.N.Y. 1991):

Motions to disqualify opposing counsel are viewed with disfavor in this Circuit because they are often interposed for tactical reasons and result in unnecessary delay. The Second Circuit has indeed been loathe to separate a client from his chosen attorney. The delay and additional expense created by substitution of counsel is

a factor to which [the Second Circuit] has attached considerable significance. Thus, although doubts should be resolved in favor of disqualification, the party seeking disqualification must carry a heavy burden, and must meet a high standard of proof before a lawyer is disqualified.

*Id.* at 802 (citations, quotation marks, and ellipses omitted) (quoting and citing numerous Second Circuit and Southern District cases).

■ Two aspects of Defendants' motion are easily disposed of in favor of Plaintiff. First, DR 5-109 is not applicable to the instant action. DR 5-109 addresses a situation wherein a conflict arises between the interests of an organization that an attorney is representing and a "director[ ], officer[ ], employee[ ], member[ ], shareholder[ ], or other constituent[ ]" of the organization. *See* N.Y.Code of Professional Responsibility DR 5-109 (1992). Defendants were never employees or otherwise "constituents" of Campbell or the Bank. Defendants' role was that of an agent acting on behalf of a principal, a role that does not implicate the rights and responsibilities which arise in the relationships enumerated in the illustrative list in DR 5-109. Second, Canon 9, standing alone, cannot be a ground for disqualifying Kenyon. Canon 9 admonishes attorneys to avoid even the appearance of impropriety. The law in this Circuit is clear, however, that Canon 9

should not be used promiscuously as a convenient tool for disqualification when the facts simply do not fit within the rubric of other specific ethical and disciplinary rules.

*Bennett,* 776 F.Supp. at 806 (quoting *International Elecs. Corp. v. Frazier,* 527 F.2d 1288, 1295 (2d Cir.1975)). Thus, unless the Court finds that disqualification is warranted under the specified sections of Canons 4 or 5, Canon 9 will not serve as the basis upon which the Court will decide the merits of Defendants' motion for disqualification.

## III.

■ Canon 4, specifically DR 4-101(A) & (B), concerns the duty of a lawyer to preserve the confidences and secrets of a client. A party moving to have an attorney

(or a firm) disqualified on the basis of Canon 4 must demonstrate that: 1) the party is a former client of the attorney; 2) there is a substantial relationship between the subject matter of the (alleged) prior representation and the issues in the instant action; and 3) the attorney had access to, or was likely to have had access to, relevant privileged information in the course of the (alleged) prior representation. *See Evans v. Artek Systs. Corp.,* 715 F.2d 788, 719 (2d Cir.1983); *Emle Indus., Inc. v. Patentex, Inc.,* 478 F.2d 562, 570–71 (2d Cir.1973); *Bennett,* 776 F.Supp. at 803.[7] When applying this test, courts must look with painstaking care at the facts. *See Bennett,* 776 F.Supp. at 803 (citing *Board of Educ. v. Nyquist,* 590 F.2d 1241, 1246 (2d Cir.1979), and other cases). As to the first prong of this test, courts have not employed a single, well-defined test for determining whether an attorney-client relationship exists, and, moreover, have consistently rejected the argument that indicia of a formal relationship are necessary. Most courts have acknowledged, as a general matter, that an attorney-client relationship exists if

> the party divulging confidences and secrets to an attorney believes that he is approaching the attorney in a professional capacity with the intent to secure legal advice.

*See, e.g., Bennett,* 776 F.Supp. at 803 (quoting *Trinity Ambulance Serv., Inc. v. G & L Ambulance Servs., Inc.,* 578 F.Supp. 1280, 1283 (D.Conn.1984)); *Keoseian v. Von Kaulbach,* 707 F.Supp. 150, 152 (S.D.N.Y.1989) (same).[8] Factors courts have considered in reaching a conclusion on this issue include: 1) whether a fee arrangement was entered into or a fee paid, *Kubin,* 801 F.Supp. at 1115; 2) whether a written contract or retainer agreement exists indicating that the attorney accepted representation, *id.; Keoseian,* 707 F.Supp. at 153; 3) whether there was an informal relationship whereby the attorney performed legal services gratuitously, *Kubin,* 801 F.Supp. at 1115; 4) whether the attorney actually represented the individual in one aspect of the matter (e.g., at a deposition), *Keoseian,* 707 F.Supp. at 151; 5) whether the attorney excluded the individual from some aspect of a litigation in order to protect another (or a) client's interest, *id.* at 151–52; 6) whether the purported client believes that the attorney was representing him and whether this belief is reasonable, *id.* at 152; *Kubin,* 801 F.Supp. at 1115.

■ Canon 4 cannot serve as a ground for disqualifying Kenyon from representing Plaintiff, because neither Seldes nor R & V was ever a client of Kenyon. Defendants do not advance evidence implicating the first three factors; therefore, the Court considers the last three factors in the order they are presented, *supra.* First, although Defendants contend that Kenyon represented Seldes at the aforementioned deposition, the Court does not believe that Defendants have convincingly established it. The fact that not just Kenyon, but all the attorneys at the deposition both advised Seldes of his right to be represented by counsel and objected to questions addressed to Seldes on the grounds of attorney-client privilege undercuts Defendants' claim that Kenyon's actions in this regard demonstrate Kenyon's commitment to represent Seldes.[9] Second, it is uncontroverted that Kenyon attorneys excluded Seldes from some aspects of settlement discussions in conjunction with the Moyers liti-

---

7. In a case in which the earlier representation constituted a joint effort between the party moving for disqualification and the party currently being represented by the attorney at issue, a fourth requirement is added: the moving party must show that there was a reasonable expectation that the information the moving party imparted to counsel in conjunction with the joint effort would not be revealed to that party's former ally during the prior representation. *See Allegaert v. Perot,* 565 F.2d 246, 250–51 (2d Cir. 1977). As the ensuing discussion will demonstrate, the Court need not reach the question whether this fourth requirement is applicable to the instant motion.

8. Other courts, however, have applied the rules governing contractual formation to determine whether such a relationship was formed. *See, e.g., Kubin v. Miller,* 801 F.Supp. 1101, 1115 (S.D.N.Y.1992); *Hashemi v. Shack,* 609 F.Supp. 391, 393 (S.D.N.Y.1984).

9. This deficiency is not remedied by the "battle of the affidavits" concerning whether the Kenyon attorneys, during a break in the deposition, secretly assured Seldes that they were representing him. Seldes' silence in the face of the warnings issued by other attorneys at the deposition supports Plaintiff's averment on this issue.

gation in order to protect the confidences of the Bank. *See, e.g.,* Pl.'s Mem.Law Opp'n Defs.' Mot.Disqualify Counsel and Mot.Dismiss at 8.

Third, although Defendants express their subjective belief that Seldes was represented by Kenyon, the Court does not find this belief reasonable. The letter from James C. Campbell to Seldes was, after all, a letter from the Bank's Hawaii counsel asking Seldes to "cooperate" with the Bank's New York counsel. This fairly unambiguous request cannot be read to suggest that counsel was being provided for Seldes, especially since no fee arrangement or retainer agreement was made or discussed, no fee was ever requested from or paid by Seldes, and, moreover, Kenyon appears at no time to have taken direction from Seldes.[10] Defendants do not directly address these particulars, but instead argue that Seldes, in turning over to Kenyon attorneys confidential documents, and relating confidences and secrets in the course of discussions with them, demonstrated his reasonable belief that they were representing him.[11] However, even rejecting *arguendo,* without so deciding, Plaintiff's rejoinder, namely that the only documents to which Kenyon attorneys were granted access were documents to which the Bank, as both

successor in interest to Campbell and principal, was entitled, Defendants' argument nevertheless fails.

> [S]ince an attorney might come into possession of a party's confidential documents through means other than serving as that party's attorney, no attorney-client relationship [may] be inferred from mere access to documents.

*Evans v. Artek Systs. Corp.,* 715 F.2d 788, 793 (2d Cir.1983).[12] Defendants also maintain that they were led to believe, by James C. Campbell's request as well as by the Kenyon attorneys, that Seldes was part of the "team" along with Kenyon, the Bank, etc., in the Moyers litigation—and that this involvement in the joint effort to vindicate the Bank's interest in that litigation made Seldes, by extension, a client of Kenyon. As noted, however, Seldes cooperated with the attorneys for all the parties in the Moyers litigation and, moreover, Defendants concede in their papers that there existed a divergence of interest between the Bank and Seldes [13]—a divergence of interest that must have been obvious to Seldes at the time and which, therefore, undermines his claim that his subjective belief that he was being represented by Kenyon was reasonable.

**10.** A legal sophisticate such as Seldes could not reasonably have failed to see the significance in this.

**11.** Not surprisingly, however, Defendants fail to respond to the suggestion by Plaintiff that if, as Defendants appear to contend, turning over documents and cooperating with counsel creates an attorney-client relationship, Seldes was also represented by the attorneys for the Moyers group and the Mythology group, since he provided affidavits, documents, and other assistance to them as well.

**12.** Support for the Court's conclusion in this regard can be found in a case taken from Defendants' brief. Defendants cite to a New York case (and in fact from a particularly damning passage in that case), which states:

> It is clear that where an attorney receives confidential information from a person who, under the circumstances, has a right to believe that the attorney, as an attorney, will respect such confidences, the law will enforce the obligation of confidence irrespective of the absence of a formal attorney-client relationship.

*Nichols v. Village Voice, Inc.,* 99 Misc.2d 822, 417 N.Y.S.2d 415, 418 (Sup.Ct.1979) *(quoted in*

Defs.' Mem.Law Supp.Mot.Disqualify Opposing Counsel at 33) (emphasis added by Defendants). Under the rule of *Nichols,* no such obligation of confidence—an obligation Defendants attempt to establish and then use to bootstrap the existence of an attorney-client relationship—arises under the facts at bar, especially in light of the language of the letter from James C. Campbell, repeatedly quoted by Defendants, requesting that Seldes cooperate with Kenyon for the benefit of the Bank in the Moyers litigation. Given the nature of this request, Seldes could not have reasonably believed that Kenyon would not share *the information it learned from Seldes* with the Bank.

**13.** [T]he [alleged] prior representation [of Seldes by Kenyon] was not a "joint effort" because at the time the Bank claims it began, in or about April 1990—simultaneous with the beginning of the relationship between, on the one hand, Kenyon & Kenyon and defendants, and on the other, Kenyon & Kenyon and Bank, there already existed ... a substantial divergence of common interests between Bank and defendants....

Defs.' Reply Mem.Law Supp.Mot.Disqualify Opposing Counsel at 10.

Having found that Defendants fail to carry their heavy burden of showing that an attorney-client relationship ever existed between Kenyon and Seldes, the Court need not address the second and third prongs of the test for establishing a Canon 4 violation.

### IV.

■ The Court rejects Defendants' remaining arguments, namely that Kenyon's continued representation of the Bank violates DR 5–105(A)–(C) and DR 5–108. DR 5–105(A)–(C) concerns conflicts of interest arising from an attorney's concurrent representation of different clients. DR 5–108 prohibits representation that creates a conflict with the interests of a former client. Having already concluded that Defendants have not carried their heavy burden of showing that Defendants were ever clients of Kenyon, the Court concludes that Defendants, therefore, cannot demonstrate that Kenyon violated either of these precepts.

### V.

For the foregoing reasons, Defendant's motion to disqualify Plaintiff's counsel and dismiss the instant action is denied.

SO ORDERED.